UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CAROL CUTTING,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )       1:16-cv-00582-JAW
                                        )
DOWN EAST ORTHOPEDIC                    )
ASSOCIATES, P.A.,                       )
                                        )
            Defendant.                  )

**ORDER ON MOTION TO DISMISS**

A disabled former patient brings this action against a medical provider, alleging disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12182 *et seq.* ("ADA"), and the Maine Human Rights Act, 5 M.R.S. §§ 4571 *et seq.* ("MHRA"). The former patient suffers from Tourette's syndrome, a disabling condition that causes her to experience involuntary motor tics. The motor tics result in involuntary arm movements. The former patient sought treatment from the medical provider for a shoulder condition. She alleges that, in the course of their interactions, the medical provider humiliated her and ultimately refused to treat her for the shoulder problems.

The medical provider moves to dismiss the ADA claim asserting that the former patient lacks standing and that a disagreement with a surgeon about the

proper surgical procedure cannot be the basis for an ADA claim.[1]  The medical provider moves to dismiss the MHRA claim on statute of limitations grounds.  The Court denies the defendant's motion to dismiss.  (ECF No. 7).

## I.    BACKGROUND

### A.    Procedural History

On November 29, 2016, Carol Cutting filed a complaint against Down East Orthopedic Associates, P.A. ("Down East").  *Compl.*  (ECF No. 1).  The Complaint contains two counts of unlawful disability discrimination: Count I—violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12182 *et seq.*; and Count II—violation of the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4571 *et seq.*  *Id.* at 5-6.  On February 10, 2017, Down East filed a motion to dismiss the complaint under Rule 12(b)(1) and 12(b)(6).  *Def.'s Mot. to Dismiss Pl.'s Compl.* (ECF No. 7) (*Def.'s Mot.*).  Ms. Cutting responded on March 3, 2017.  *Pl.'s Opp'n To Def.'s Mot. To Dismiss* (ECF No. 9) (*Pl.'s Opp'n*).  Down East replied to Ms. Cutting's response on March 17, 2017.  *Def.'s Reply in Supp. of Mot. to Dismiss* (ECF No. 10) (*Def.'s Reply*).

### B.    The Alleged Facts[2]

#### 1.    The Parties

---

[1]    The medical provider does not contest the former patient's ADA claim on statute of limitations grounds, as such the Court does not address the arguments the former patient makes on this issue. *See Pl.'s Opp'n* at 4-5.

[2]    In considering a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff []." *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir. 2001)).

Carol Cutting is a resident of Bangor, Maine. *Compl.* ¶ 3. Ms. Cutting has suffered from Tourette's syndrome for many years; this condition causes her to have repeated vocal and motor tics, including occasional arm movements. *Id.* ¶ 11. Based on the substantial limitations in major life activities caused by her Tourette's syndrome, Ms. Cutting is a qualified individual with a disability within the meaning of the ADA and the MHRA. *Id.* ¶ 12. At all times relevant to the Complaint, she was a patient of Down East. *Id.* ¶ 5.

Down East Orthopedic Associates, P.A. is a duly authorized Maine business corporation that operates a private medical practice in Bangor. *Id.* ¶ 4. D. Thompson McGuire, M.D. ("Dr. McGuire") is an orthopedic surgeon licensed to practice medicine in Maine and an employee of Down East. *Id.* ¶ 6.

### 2. Office Visit

In 2013, Ms. Cutting's primary care physician referred her to Dr. McGuire for right-shoulder pain she had been feeling since experiencing a fall at home in 2011. *Id.* ¶¶ 9-10. Physical therapy and other conservative forms of pain management had not resolved the pain. *Id.* ¶ 10. On June 20, 2013, Ms. Cutting had her first and only office visit with Dr. McGuire. *Id.* ¶ 15. Down East is a place of public accommodation within the meaning of Title III of the ADA. *Id.* ¶ 14. At that office visit, Dr. McGuire diagnosed Ms. Cutting with acromioclavicular arthritis based on her constant shoulder pain, as well as possible rotator cuff tendinitis and impingement, and he devised a treatment plan consisting of right shoulder arthroscopy, subacromial

decompression, and open distal clavicle excision, to be performed on November 13, 2013. *Id.* ¶¶ 15-16.

During the office visit, Dr. McGuire noticed Ms. Cutting's vocal and motor tics and treated her in a disrespectful, rude, and insulting manner. *Id.* ¶ 17. Dr. McGuire moved his seat across the room to create significant distance between himself and Ms. Cutting, stating, "I don't want you to hit me," in reference to her tics. *Id.* ¶ 18. The statement was humiliating and demeaning to Ms. Cutting, as her unavoidable tics are non-violent. *Id.* ¶ 19. Down East regarded Ms. Cutting as disabled based on the conduct of its employee, Dr. McGuire. *Id.* ¶ 13. Dr. McGuire never told Ms. Cutting prior to the time he performed surgery on her that her Tourette's syndrome would have an impact on his approach to surgery. *Id.* ¶ 20.

### 3. Surgery

On November 13, 2013, Dr. McGuire performed arthroscopic surgery on Ms. Cutting's right shoulder. *Id.* During the surgery, Dr. McGuire discovered that Ms. Cutting had a full-thickness rotator cuff tear with two centimeters of retraction. *Id.* ¶ 21. Dr. McGuire performed debridement of the area, but he did not repair Ms. Cutting's rotator cuff tear. *Id.* ¶ 22. Dr. McGuire and/or his staff later explained to Ms. Cutting that her shoulder could not be repaired during surgery because she would "just tear it again" when she woke up from surgery, in reference to moving her shoulder during uncontrollable motor tics. *Id.* ¶ 23.

### 4. Down East's Failure to Make Modification

Down East, as a place of public accommodation, is obligated to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. *Id.* ¶ 25. The modification that Down East should have provided to Ms. Cutting was to repair the rotator cuff tear during the surgery, and to provide her a shoulder immobilizer to address any concern of involuntary movement of her shoulder. *Id.* ¶ 26. This modification for Ms. Cutting's disability was easily achievable and should have been obvious to Dr. McGuire. *Id.* ¶ 27. Providing such modification to Ms. Cutting would not have imposed an undue hardship upon Down East. *Id.* ¶ 28.

### 5. Continued Pain and Later Assessment by other Medical Provider

Ms. Cutting continued to suffer from daily pain and exacerbation of her rotator cuff tear for a year after Dr. McGuire refused to repair her shoulder. *Id.* ¶ 29. Plaintiff consulted with another orthopedic surgeon, Jessica Aronowitz, M.D., who ordered an MRI that was performed on November 23, 2014. *Id.* ¶ 30. Dr. Aronowitz reviewed the MRI with Ms. Cutting during a December 4, 2014 office visit in which she noted a full-thickness rotator cuff tear and recommended another surgery to repair the tear. *Id.* ¶¶ 31-32. To address Ms. Cutting's Tourette's syndrome, Dr. Aronowitz recommended a shoulder immobilizer following surgery to make sure Ms. Cutting did not move her shoulder during an involuntary motor tic. *Id.* ¶ 33. At this December 4, 2014 appointment, upon learning that immobilization of her shoulder was readily achievable, Ms. Cutting developed reasonable cause to believe that Dr.

McGuire had discriminated against her on the basis of her disability, and denied her reasonable medical care. *Id.* ¶ 34. As of December 4, 2014, Ms. Cutting realized that Dr. McGuire's failure perform the surgery in November of 2013, followed by immobilization of her shoulder, amounted to a failure to provide her with a necessary modification for her disability. *Id.* ¶ 35.

## II. LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, the court must distinguish 'the complaint's factual allegations (which must be

accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## III. DISCUSSION

### A. ADA Claim

In enacting the ADA, Congress provided a broad mandate to eliminate disability discrimination nationwide. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). In doing so, Congress found that "[d]iscrimination against individuals with disabilities persists in such critical areas as . . . health services" among others. 42 U.S.C. § 12101(a)(5). Title III of the Act forbids discrimination against disabled individuals in public accommodations, including a " . . . professional office of a health care provider, hospital, or other service establishment." *Id.* §§ 12181(7)(F), 12182. "It sends a bluntly worded message to those establishments that fall within its purview: you may not discriminate against an individual in the full and equal access to goods and services on the basis of a disability." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 303 (1st Cir. 2003). Section 12182(a) of the Act defines discrimination to include "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the

entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(a).

Ms. Cutting alleges that, in refusing to perform the necessary repair of her rotator cuff during the surgery because of her Tourette's syndrome, Dr. McGuire engaged in unlawful disability discrimination against her in violation of the ADA. *Compl.* ¶ 24. Specifically, Ms. Cutting asserts that Dr. McGuire's conduct prevented her from the full and equal enjoyment of and access to services in a place of public accommodation. *Id.* ¶ 38. She points out that being a place of public accommodation, Down East is required under the statute to make reasonable modifications or accommodations to individuals, such as herself, with disabilities. *Id.* ¶ 25. Ms. Cutting asserts that the modification Down East was required and failed to make was to repair the rotator cuff tear during the surgery and then prescribe a shoulder immobilizer to address any concern about the impact of involuntary shoulder movements on the rotator cuff. *Id.* ¶ 26.

Down East does not dispute that it is a place of public accommodation under the ADA or that such entities are required to provide modifications to persons with disabilities pursuant to the Act. *Def.'s Reply* at 12-13. Instead, Down East groups its arguments for dismissal of Count I into two categories: (1) that Ms. Cutting lacks Article III standing to bring her ADA claim; and (2) that she fails to set forth a viable ADA claim.

### 1. Standing

As an extension of the United States Constitution's limitation of the Article III courts' jurisdiction to "Cases" and "Controversies," U.S. CONST. ART. III, § 2, cl.2, the United States Supreme Court has developed the doctrine of constitutional standing. In *Lujan v. Defenders of Wildlife*, the Supreme Court elucidated the three elements of the "irreducible constitutional minimum of standing" that a party invoking federal jurisdiction must establish: (1) an injury in fact that is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood that the court could redress the injury with a favorable decision. 504 U.S. 555, 560-61 (1992). Defendant challenges whether Ms. Cutting has established an injury in fact and a likelihood of redressability of any such injury.

### a. Injury in Fact

An injury in fact is the invasion of a legally protected interest which is neither conjectural nor hypothetical. *Lujan*, 504 U.S. at 560. Such invasion must affect the plaintiff in a personal and individual way. *Id*. The plaintiff must show that she "sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and [that] the injury or threat of injury [is] both real and immediate . . . ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). "[A] plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a 'real and immediate threat' of repeated future harm to satisfy the

injury in fact prong of the standing test." *Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329, 1333 (N.D. Cal. 1994) (quoting *Lyons*, 461 U.S. at 111).

Although the plaintiff need not engage in the "futile gesture" of seeking services to which plaintiff knows the provider has erected discriminatory barriers and that the provider has no intention of remedying, *see* 42 U.S.C. § 12188(a)(1), she must at least prove knowledge of the barriers. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181-84 (2000) (noting proof that environmental plaintiffs would use waterway for recreational purposes but for polluted condition is sufficient to show injury in fact); *Disabled Americans for Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 65 n.7 (disabled plaintiff need not engage in futile gesture in order to establish either constitutional standing to sue or a private right of action under Title III of the ADA); *see also Steger v. Franco, Inc.*, 228 F.3d 889, 892-93 (8th Cir. 2000). Thus, "although a plaintiff need not repeatedly suffer discrimination in order to assert [his] rights under Title III, ADA plaintiffs who seek injunctive relief must demonstrate that they themselves face a real and immediate threat of future harm . . . ." *Deck v. Am. Haw. Cruises*, 121 F. Supp. 2d 1292, 1297 (D. Haw. 2000). Intent to return to the place of injury "some day" is insufficient. *Lujan*, 504 U.S. at 564.

Courts have held that "a single past incident of discrimination can provide as grounds for a plaintiff's standing, as long as the lack of accommodation continues to exist." *Dudley v. Hannaford Bros. Co.*, 146 F. Supp. 2d 82, 86 (D. Me. 2001) (collecting cases). As the First Circuit observed, "this ruling enjoys substantial support."

*Dudley*, 333 F.3d at 304 n.2. In many cases where courts have found plaintiffs to have established an injury in fact after having only been subjected to single instances of past disability discrimination, the context for these plaintiffs' assertions of imminent future harm have been clear. Many of these have involved retail stores and physical accessibility barriers. *See, e.g., Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002) (plaintiff alleged he would shop at one location of plaintiff's preferred grocery store chain near his grandmother's home if it were accessible); *Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065 (D. Haw. 2000) (plaintiff had history of patronizing restaurant chain and intended future visits to then-inaccessible location).

Courts have also employed such reasoning in cases involving the provision of medical services. In *Maine Human Rights Commission v. Sunbury Primary Care*, the Court stated that the plaintiff had "standing to bring suit because the Complaint is sufficient to infer allegations of future harm." *Me. Human Rights Comm'n*, 770 F. Supp. 2d 370, 399 (D. Me. 2011). In her complaint, the plaintiff alleged that her former medical provider violated Title III of the ADA by failing to provide her a reasonable modification for her disability. *Compl.* at 2-4, *Maine Human Rights Commission v. Sunbury Primary Care*, 770 F. Supp. 2d 370 (D. Me. 2011) No. 1:09-cv-00466-JAW ECF No. 3 Attach 1 *State Court Complaint*). She also alleged that the provider continued to refuse to provide her such reasonable modification. *Id.* These allegations are substantially similar to those Ms. Cutting brings before the Court.

In *Blake v. Southcoast Health System, Inc.*, the District of Massachusetts held that a decedent's estate did not have standing to sue for injunctive relief after having brought an ADA discrimination claim arising out of the defendant health care provider's "discriminatory [medical] malpractice" that led to her death. 145 F. Supp. 2d 126, 132 (D. Mass. 2001). However, the *Blake* Court suggested that the decedent might have had standing to bring the same claim had she survived her discriminatory neglect: "there is no possibility that the named defendants can harm Betty Ann in the future because their discrimination and malpractice killed her. Therefore, Betty Ann cannot further be harmed and her Estate lacks standing to sue for an injunction, the only available relief under Title III of the ADA." *Id.* at 137.

"When a disabled plaintiff alleges that he was denied accommodations at a hospital in violation of the ADA, courts have considered several factors to determine whether the plaintiff has alleged or established a 'real or immediate threat' of injury, including: whether the plaintiff resides within close proximity to the defendant's hospital; the number of prior visits alleged by the plaintiff; whether the plaintiff has a medical condition that will likely require[] attention in the future; and whether the defendant hospital has changed its policy so as to accommodate the plaintiff in the future." *Benavides v. Laredo Med. Ctr.*, No. L-08-105, 2009 WL 1755004 at *4 (S.D. Tex. Jun. 18, 2009) (citing *Freydel v. N.Y. Hosp.*, No. 00-7108, 2000 WL 1836755, at *6 (2d Cir. Dec. 13, 2000) (denying standing where, despite plaintiff's allegation that she suffered from a chronic condition, plaintiff could not show that she would be referred to the defendant hospital in the future because a number of tertiary care

centers were located closer to plaintiff's home)). These fact-intensive inquiries predictably yield a variety of outcomes. *See, e.g., Constance v. State Univ. of N.Y. Health Sci. Ctr. at Syracuse*, 166 F. Supp. 2d 663, 667 (N.D.N.Y. 2001) (denying standing where plaintiffs stated they generally use a different hospital and had not sought services from defendant hospital either before or after the events at issue); *Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329, 1334 (N.D. Cal. 1994) (denying standing where plaintiff did not establish she is likely to use defendant hospital and only showed that she owned a mobile home near the defendant hospital and stayed at the home "for several days each year"); *Benavides v. Laredo Med. Ctr.*, No. L-08-105, 2009 WL 1755004, at *4 (S.D. Tex. Jun. 18, 2009) (finding standing where plaintiff will likely require defendant-provider's services again due to history of using provider and ongoing chronic health conditions); *Sanchez v. ACAA*, 247 F. Supp. 2d 61, 68 (D.P.R. 2003) (denying standing where plaintiff-patient has not alleged that he plans to use defendants' medical services in the future, and the record suggests that he will not use those services).[3]

Down East argues that Ms. Cutting's allegations do not demonstrate an actual or imminent threat of harm. Down East further argues that the conduct of which Ms. Cutting complains cannot constitute an injury in fact supporting standing because it was a one-time, ad-hoc occurrence, as opposed to an instance of institutionalized

---

[3]      The analysis in some of these cases blends discussion of the injury in fact requirement for Article III standing with discussion of the real and immediate threat of future harm requirement for injunctive relief under Title III of the ADA. The same facts and analysis apply with equal force to both issues, as the Title III harm requirement "has been adapted from" the constitutional standing injury-in-fact inquiry. *Dudley*, 333 F.3d at 305-06; *Ferries del Caribe*, 405 F.3d, 64, 65 n.7.

discriminatory procedure or policy that might support standing.  Down East contends that, even if one instance of past discrimination alone can serve as the predicate to establishing an injury in fact, it must be accompanied by a legitimate threat of reoccurrence.  Defendant argues that such a threat is lacking in the instant case.

Ms. Cutting relies on the First Circuit's opinion in *Dudley* in advancing her argument that Down East has failed to remedy the basis for the discriminatory treatment that she suffered.  *Pl.'s Opp'n.* at 7-9 (quoting *Dudley*, 333 F.3d at 307 ("Limiting Title III relief to instances in which a future violation appears certain to occur would create a standard far more demanding than that contemplated by the congressional objectives that influenced the ADA")).  She asserts that she would be treated similarly if she were to return to Down East, and argues that she is deterred from seeking services again at Down East.  *Pl.'s Opp'n* at 9.

Down East is located in Bangor, Maine, the same city where Ms. Cutting resides.  *Compl.* ¶¶ 3, 4.  Ms. Cutting she asserts that "there is no reason to doubt that she would have returned for additional orthopedic care in the future had she not been denied medical treatment because of her disability."  *Pl.'s Opp'n.* at 9.  In support of her suggestion that she would seek services from Down East in the future, Ms. Cutting does not speak to the existence, or lack thereof, of an ongoing medical condition that would require future treatment.  However, she cites her history as a Down East patient: "Ms. Cutting was a patient of Down East's long before Dr. McGuire discriminated against her, when another [Down East] physician treated her for a different orthopedic injury."  *Pl.'s Opp'n.* at 9.

Accepting Ms. Cutting's allegations regarding the likelihood of her return to Down East for services but for its discriminatory practices as true, as the Court must, the Court finds that Ms. Cutting has pleaded sufficient facts to establish the existence of an injury in fact that supports her constitutional standing to bring her claims.

### b. Redressability

Where a plaintiff has alleged an ongoing barrier to access, the injury is ongoing so long as "the barrier remains in place." *Fiedler v. Ocean Props., Ltd.*, 683 F. Supp. 2d 57, 73 (D. Me. 2010) (quoting *Dudley*, 333 F. 3d at 305). Here, if the Court concludes that there was a violation, the Court can redress the harm with an appropriately framed injunction.

Down East argues that, because Ms. Cutting's claims are based on past alleged conduct and harm and she makes no representation about the likelihood she will suffer future harm, Ms. Cutting fails to show how a favorable decision by the Court would likely redress her injury. *Def.'s Mot* at 10.

Ms. Cutting responds that "the operative question is not how many attempts a plaintiff has made to overcome a barrier to accessing a place of public accommodation, but instead whether that barrier remains in place." *Pl.'s Opp'n* at 9–10. Ms. Cutting asserts that she would have returned for future treatment at Down East were it not for her injury and the barrier erected by Down East's "discriminatory practices toward patients with Tourette's [s]yndrome." *Pl.'s Opp'n* at 9–10. She asserts that Down East has taken no steps to correct the practices of which she complains— thereby continuing to deter her from returning to Down East. *Pl.'s Opp'n* at 9-10.

This is enough. Based on the factual allegations of Ms. Cutting, an injunction issued by this Court would remove a current barrier to her accessing services at Down East.

Ms. Cutting has pleaded sufficient facts to establish that (1) she has suffered an actual injury that is concrete and particularized to her, and (2) that a favorable decision from the Court could redress her injury. The establishment of these two elements, in addition to the causal connection between the injury and the conduct complained of (which the Defendant does not dispute), allows the Court to conclude that Ms. Cutting has standing to bring the justiciable case or controversy that is embodied in the present action before the Court for adjudication.

### 2.     Viability of Title III Claim

Down East cites the First Circuit's recitation of what the plaintiff in *Dudley* had to show in order to state a viable Title III claim and suggests that Ms. Cutting must make the same showing. *Def.'s Mot.* at 12 (citing *Dudley*, 333 F.3d at 307). However, a close examination of *Dudley* reveals that the First Circuit specified that it was laying out the prima facie case elements that a plaintiff must show in order "[t]o recover under section 12182(b)(2)(A)(ii) *in a retail sale case* . . . ." *Dudley*, 333 F.3d at 307 (emphasis supplied). Retail means the "sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing." *Retail*, BLACK'S LAW DICTIONARY (10th ed. 2014). Commodity is a "term [that] embraces only tangible goods, such as products or merchandise, as distinguished from services." *Commodity*, BLACK'S LAW DICTIONARY (10th ed. 2014). As such, "retail sale"

does not include the provision of medical services. Consequently, the elements in *Dudley* do not necessarily apply to the present case.

A more apt recitation of what a plaintiff must show in Title III ADA case is found in a case the First Circuit cited: *Amir v. St. Louis University*, 184 F.3d 1017 (8th Cir. 1999). In *Amir*, the plaintiff alleged that a university discriminated against him on the basis of his obsessive compulsive disorder when it assigned him a failing grade in a psychiatry clinic and expelled him after he filed a grievance. The *Amir* Court expounded, "A person alleging discrimination under Title III must show (1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation." *Id.* at 1027 (citing 42 U.S.C. § 12182(a) and (b)(2)(A)(ii)).

Down East does not contest that Ms. Cutting is disabled or that it operates a place of public accommodation within the meanings of the ADA. Nor does Down East suggest that the modification that Ms. Cutting alleges it should have made— repairing her rotator cuff tear and immobilizing her shoulder—would have fundamentally altered the nature of its business. The Court turns to the one contested element: whether Dr. McGuire's decision not to repair the rotator cuff tear was based upon Ms. Cutting's disability.

### a.     Discrimination in form of Medical Decision

Down East posits that the decision to simply perform debridement in the area of the rotator cuff tear and not to repair the tear was a medical decision made based on Ms. Cutting's condition, the risks and benefits of a given procedure or treatment, and alternatives, and that such medical decisions cannot constitute a discriminatory policy or practice. *Def.'s Mot.* at 13.

The First Circuit has not had occasion to address whether a decision regarding medical treatment is actionable as disability discrimination. The weight of authority from other jurisdictions is on the side of Down East, though the cases tend to turn on their peculiar facts. In sum, the Court concludes that whether Dr. McGuire's decision not to repair Ms. Cutting's rotator cuff tear was purely medically motivated or discriminatory is too fact-intensive a question for the Court to resolve on the basis of a motion to dismiss.

Ms. Cutting clearly pleaded a sufficiently direct connection between her disability and the decision not to repair her rotator cuff tear—namely that after the surgery, Down East put forward her disability as the sole reason for the decision not to provide her the service she sought. *Compl.* ¶¶ at 23-24, 34; *Pl's Opp'n* at 12. This is an issue ripe for factual development. *See e.g., Grant v. Alperovich*, 993 F. Supp. 2d 1356, 1364-65 (W.D. Wash. 2014) (granting defendant medical providers summary judgment on ADA claims premised on a decision not to perform surgery on disabled plaintiff; plaintiff had developed insufficient record to support allegation that decision not to perform surgery was made because of plaintiff's disability).

### b.    Injunctive Relief under Title III

Title III of the ADA provides that both private litigants and the Attorney General may seek injunctive relief.  42 U.S.C. § 12188(a)-(b); 42 U.S.C. § 2000a-3; *see Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 50 (1st Cir. 2006).  However, only the latter can seek such relief on the basis of solely past harm.  *Id.*  "Title III is not intended to provide redress [to individuals] for past discrimination that is unlikely to recur . . .," *Dudley*, 333 F. 3d at 304, and an injunction is intended to forestall future violations, not to punish past ones.  Accordingly, plaintiffs in Title III cases are generally required to show "some ongoing harm (or, at least, a colorable threat of future harm)." *Id.* (citing 42 U.S.C. § 2000a–3(a) (permitting a civil action for injunctive relief whenever "there are reasonable grounds to believe that any person *is about to engage in any [prohibited] act or practice* ") (emphasis in original)); *see Fiedler*, 683 F. Supp. at 73 (same).  This corresponds with the axiomatic need, in the context of injunctive relief more generally, for a plaintiff to show that an injunction is necessary to prevent irreparable harm.  *See Nat'l Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 824 (1st Cir.1979).  As the First Circuit has noted, the standard for Title III plaintiffs to show a real and immediate threat of future harm "has been adapted from" the constitutional standing injury-in-fact inquiry.  *Dudley*, 333 F.3d at 305-06.  As such, much of the Court's above analysis of that issue applies to this inquiry.  *See supra* Section III(A)(1)(a).

In demonstrating a likelihood of future harm, a person with a disability need not "engage in a futile gesture if such person has actual notice that a person or

19

organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1); *see also Dudley*, 333 F.3d at 305. "[T]he existence of private right of action under section 12188(a)(1) does not depend upon how many attempts a plaintiff has made to overcome a discriminatory barrier, but, rather, upon whether the barrier remains in place." *Dudley*, 333 F.3d at 305.

Ms. Cutting, who sought and received services from Down East before the events giving rise to this case, pleads that "there is no reason to doubt that she would have returned for additional orthopedic care in the future had she not been denied medical treatment because of her disability." *Pl.'s Opp'n.* at 9. She suggests that she would seek services from Down East in the future, and that if she did, she would likely suffer discrimination based on her disability again. *Pl.'s Opp'n.* at 9, 12. This is sufficient for her to have pleaded a colorable threat of future harm. The Court concludes that Ms. Cutting has stated a viable claim under Article III of the ADA.

## B. MHRA Claim

Ms. Cutting alleges that Down East engaged in unlawful disability discrimination in violation of the MHRA. *Compl.* ¶¶ 40-42. In its motion to dismiss, Down East alleges that Ms. Cutting missed the statutory filing period for claims under the statute. *Def.'s Mot.* at 3–4. In reply, Ms. Cutting argues that the statute of limitations does not bar her MHRA claim, and furthermore that her filing was timely because the discovery rule and continuing violation doctrine apply to her claim. *Pl.'s Opp'n* at 5-6.

In general, "[g]ranting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *Bean v. Wal-Mart Stores, Inc.*, No. 2:16-cv-631-GZS, 2017 WL 530440, at *3 (D. Me. Feb. 9, 2017) (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998)). That is, the facts underlying the defense must be present on the face of the plaintiff's pleadings. *Santana-Castro v. Toledo-Davila*, 579 F.3d 109, 113-114 (1st Cir. 2009).

### 1. Statute of Limitations

The MHRA requires that an action "must be commenced not more than either 2 years after the act of unlawful discrimination complained of or 90 days after any of the occurrences listed under section 4622, subsection 1, paragraphs A to D, whichever is later." 5 M.R.S. § 4613(2)(C). The various triggers referenced in section 4622 are ways in which a complainant can exhaust her remedies before the Maine Human Rights Commission. *Id.* § 4622(1)(A)-(D). Neither party contends that these potential statute of limitation triggers in section 4622(1) apply to Ms. Cutting's claims; however, they disagree about the applicability of the other trigger in section 4613(2)(C), which would require filing of the present action within two years of the latest alleged act of discrimination.

### a. 5 M.R.S. § 4622(1) Exception

Ms. Cutting contends that 5 M.R.S. § 4622(1) "invalidates the MHRA's limitations on actions in this case." *Pl.'s Opp'n* at 5. The section generally precludes recovery of "civil penal damages or compensatory and punitive damages under section

4613" unless the plaintiff previously filed a complaint with the Maine Human Rights Commission and exhausted her remedies before that body. 5 M.R.S. § 4622(1); *Doyer v. RSU 16*, No. 2:14-cv-00025-JAW, 2014 WL 4100942, at *5 (D. Me. Aug, 18, 2014). However, the statute contains an exception that, as the First Circuit explained, "allows those remedies to be granted if an untimely MHRA claim is joined with a claim that does not require administrative exhaustion," such as an ADA Title III claim. *Dudley*, 333 F.3d at 312. The exception merely speaks to the availability of certain remedies. It does not, as Ms. Cutting suggests, invalidate the statute of limitations in section 4613(2)(C).

### b. Interaction with 14 M.R.S. § 752

14 M.R.S. § 752 sets forth a general six-year statute of limitations for civil actions, "except as otherwise specially provided." *Id.* As the Court observed above, the MHRA specially provides for its own statute of limitations. *See also Richards v. City of Bangor, Me.*, 878 F. Supp. 2d 271, 277 (D. Me. 2012). Therefore, by the plain language of the two statutes, read together, 14 M.R.S. § 752 does not apply to Ms. Cutting's MHRA action. Ms. Cutting suggests that the Court nevertheless apply the six-year limitation period to her claim. *Pl.'s Opp'n* at 1, 4. Ms. Cutting cites one case that addresses both statutes: *Conners v. Maine Medical Center*, 42 F. Supp. 2d 34 (D. Me. 1999). However, that case does not support Ms. Cutting's contention.

In *Conners*, the Court applied 14 M.R.S. § 752 to an ADA claim, not to an MRHA claim. *Id.* at 51. It did so because "[w]here a federal statute does not contain an express limitations period, federal courts must adopt the most analogous state

statute of limitations . . . [,and at that time n]o court ha[d] determined the appropriate limitations period under Maine law to apply to Title III ADA claims." *Id.* Not only was the *Conners* Court's adoption of section 752's six-year period limited to the ADA, but the Court specifically enforced the MHRA's own two-year statute of limitations against the plaintiff's MHRA claim, granting the defendants summary judgment on that basis. *Id.* at 56. 14 M.R.S. § 752 does not save Ms. Cutting's MHRA claim from the two-year statute of limitations.

### c.     Interaction with 28 U.S.C. § 1658

Ms. Cutting also suggests that the catchall four-year statute of limitations in 28 U.S.C. § 1658 should apply to her MHRA claim. *Pl.'s Opp'n* at 1. She cites no authority for the contention and the Court found none.

The text of section 1658 explicitly confines its reach to "civil action[s] arising under an Act of Congress." *Id.* § 1658(a). "The most familiar definition of the statutory 'arising under' limitation is the statement by Justice Holmes that a suit 'arises under the law that creates the cause of action.'" *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 377 (2004) (interpreting § 1658 and its application to two different federal statutes) (quoting *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)). The law that creates Ms. Cutting's MHRA cause of action is not an Act of Congress, but an Act of the Maine State Legislature.[4]

### d.     Discovery Rule and Continuing Violation Doctrine

---

[4]      This is true irrespective of the similarities between the MHRA and the ADA. *See Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 857 n.2 (1st Cir. 1998); *Dudley v. Hannaford Bros. Co.*, 190 F. Supp. 2d 69, 73 (D. Me. 2002).

Ms. Cutting filed her complaint on November 29, 2016. That date is more than two years after her interactions with Down East that gave rise to her MHRA claim, all of which took place in 2013.[5] Ms. Cutting points to her December 4, 2014 appointment with Dr. Aronowitz, at which she learned that immobilization of her shoulder was readily achievable, as the moment when she developed reasonable cause to believe that Dr. McGuire had discriminated against her on the basis of her disability, and denied her reasonable medical care. *Compl.* ¶ 34; *Pl.'s Opp'n* at 6. She does not directly contend that the two-year limitation under § 4613(2)(C) should be tolled until that date, but she suggests so. *Pl.'s Opp'n* at 6.

Ms. Cutting argues that the equitable doctrines of the discovery rule and the continuing violations doctrine apply to her MHRA claim, and rescue it from the two-year statute of limitations. *Pl.'s Opp'n* at 6. In doing so, she cites no caselaw applying the discovery rule to MHRA claims. Nor does she cite any caselaw applying the continuing violations doctrine to MHRA claims.

Under Maine law, a cause of action generally accrues at the time the plaintiff suffers her injury. *Descoteau v. Analogic Corp.*, 696 F. Supp. 2d 138, 142 (D. Me. 2010). The discovery rule is an exception to this general rule that, when applicable, allows a plaintiff to sustain claims that would otherwise be time-barred because she was not aware of the harm at the time it was inflicted. Pursuant to the rule, the cause of action accrues when the plaintiff discovers or reasonably should have

---

[5] Although not determinative, Ms. Cutting uses the date of the McGuire surgery as the date her ADA claim accrued. *Pl.'s Opp'n* at 5 n.4 ("Plaintiff filed her complaint on November 29, 2016, less than 4 years after her first . . . shoulder surgery performed by Dr. McGuire on November 13, 2013").

discovered the injury that forms the basis of the litigation.  *See Conners v. Me. Med. Ctr.*, 42 F. Supp. 2d 34, 51 (D. Me. 1999).  The Maine Supreme Judicial Court has "limited the application of the discovery rule to three discrete areas: legal malpractice, foreign object and negligent diagnosis medical malpractice, and asbestosis."  *Johnston v. Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996).  Disability discrimination is not among those areas.

Ms. Cutting asserts that "the Law Court has applied the 'continuing violations doctrine' to MHRA claims" and quotes from *LePage v. Bath Iron Works Corp.*, 2006 ME 130.  *Pl.'s Opp'n* at 6.  Ms. Cutting expressly claims that "the Law Court has applied the 'continuing violation doctrine' to MHRA claims, explaining that the doctrine is 'intended to toll applicable limitation periods until a reasonable person would have become aware of the facts supporting the claim of discrimination."  *Id.* (quoting *LePage*, 2006 ME 130, ¶ 11).

Ms. Cutting, however, reads too much into *LePage.*  The Law Court itself later stated that, in *LePage*, it merely "discussed the possible applicability of the doctrine in the context of employment discrimination cases," and it "ha[s] never adopted the continuing violations doctrine as a means of tolling the statute of limitations."  *McKinnon v. Honeywell Intern., Inc.*, 2009 ME 69, ¶ 14, 977 A.2d 420.

The Court is concerned about whether Ms. Cutting has presented a valid basis in Maine law for applying either the discovery rule or the continuing violations doctrine to her MHRA claim.  "Federal court is not the place to make new state law."  *Town & Country Motors, Inc. v. Bill Dodge Auto. Grp., Inc.*, 115 F. Supp. 2d 31, 33

(D. Me. 2000); *see also Ramirez v. DeCoster*, 194 F.R.D. 348, 360 n.19 (D. Me. 2000) ("[A] federal court is not the forum to develop an extension of state law."); *Douglas v. York Cty.*, 433 F.3d 143, 149 (1st Cir. 2005) ("It is not our role to expand Maine law; that is left to the courts of Maine").

Nevertheless, the Court is uncomfortable making this determination in the context of a motion to dismiss. This is because it is unclear whether the record in this case, when fully developed, would support her discovery rule or continuing violations claims. *See McKinnon*, 2009 ME 69, ¶ 16 ("We are also not convinced . . . that the doctrine of a 'self-concealing fraud,' even if it were adopted in Maine, is adequately established in the record"). In 1982, the Maine Supreme Judicial Court carved out an exception to running of the statute of limitations in so-called foreign object cases involving medical malpractice claims. *Myrick v. James*, 444 A.2d 987 (Me. 1982). Following *Anderson v. Neal*, 428 A.2d 1189 (Me. 1981), where the Law Court applied the discovery rule to an allegedly negligent title search by an attorney, the *Myrick* Court emphasized the "great confidence and trust" a patient must place in her surgeon and that the nature of the surgeon's negligence is "*unknown* and *unknowable.*" *Id.* at 995 (emphasis in original).

Given the facial similarity between a foreign object and the orthopedic surgeon's representations to Ms. Cutting, the Court is not able, on the basis of the allegations in the Complaint alone, to assess whether the facts in this case could generate a claim either for the discovery rule or a continuing violation, although the latter seems more remote. The allegations in the Complaint are bare bone and it

strikes the Court that this issue would be better resolved on the basis of a more complete record and a more complete briefing.

## IV. CONCLUSION

The Court hereby DENIES the Defendant's Motion to Dismiss Plaintiff's Complaint Pursuant to F. R. Civ. P. 12(b)(1) and (6) (ECF No. 7).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2017