UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CAROL CUTTING, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:16-cv-00582-JCN |
| | ) | |
| DOWN EAST ORTHOPEDIC ASSOCIATES, P.A., | ) ) | |
| | ) | |
| Defendant | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff alleges Defendant discriminated against her, in violation of the Americans with Disabilities Act and the Maine Human Rights Act, based on her Tourette's syndrome. (Complaint, ECF No. 1.) The matter is before the Court on Defendant's motion for summary judgment. (Motion, ECF No. 35.)

Following a review of the summary judgment record, and after consideration of the parties' arguments, the Court grants Defendant's motion for summary judgment.

**FACTUAL BACKGROUND**

**A. Plaintiff's Disability**

Plaintiff suffers from Tourette's syndrome, which causes her to have repeated involuntary body movements, including repetitive shoulder flexion of the right arm in an outward motion, which medical records have described as resembling a punching motion. (DSMF ¶ 1, ECF No. 36.) Plaintiff characterizes her tics as more of a "pointing" motion, and describes them as not entirely "involuntary," but more like "strong compulsions." (PSAMF ¶¶ 20 – 24, ECF No. 43.) The frequency and severity of Plaintiff's tics depend

on certain factors, including her stress level and whether she is comfortable in her surroundings. (*Id.* ¶ 28.)

In June 2013, Plaintiff was referred to D. Thompson McGuire, M.D., an orthopedic surgeon employed by Defendant, for right shoulder pain that had been persistent since she fell in 2011. (DSMF ¶ 2.)

**B.    The Medical Findings at the Initial Appointment**

On June 20, 2013, Dr. McGuire examined Plaintiff's right shoulder. (*Id.* ¶ 4.) The examination and testing revealed that Plaintiff had full range of motion of the right shoulder, motor strength of 5/5, pain with cross body abduction, tenderness localized to her acromioclavicular joint, and impingement sign testing was equivocal. (*Id.* ¶ 5.) X-rays of the right shoulder, which Dr. McGuire reviewed with Plaintiff, revealed joint narrowing and mild arthritic changes at the acromioclavicular joint. (*Id.* ¶¶ 7, 8.) An earlier MRI showed supraspinatus tendinopathy, a partial rotator cuff tear, but no full thickness rotator cuff tear. (*Id.* ¶¶ 9, 10; PRDSMF ¶ 10, ECF No. 43.) Dr. McGuire documented that physical therapy did not improve Plaintiff's symptoms and that Plaintiff had undergone unsuccessful trials of Lidoderm, medical marijuana, and injections. (DSMF ¶ 11.) Dr. McGuire also noted that Plaintiff had Tourette's syndrome with "uncontrollable, intense, involuntary motions of right upper extremity frequently." (*Id.* ¶ 12.)

Dr. McGuire diagnosed Plaintiff as suffering from acromioclavicular arthritis with possible rotator cuff tendonitis and impingement, and recommended surgery. (*Id.* ¶¶ 6, 13, 14.) Plaintiff expressed a desire for the surgery, but she wished to delay the surgery until October 2013 due to her summer plans. (*Id.* ¶ 16.)

## C. Doctor McGuire's Conduct During the Initial Appointment

At the initial appointment, after Plaintiff told Dr. McGuire that she had Tourette's, according to Plaintiff, Dr. McGuire moved across the exam room, and stated, "I don't want you to hit me." (PSAMF ¶ 3.) Plaintiff explained to Dr. McGuire that her Tourette's would not cause her to hit him; she said, "I've never hit anybody." (PSAMF ¶¶ 9 – 11.) Plaintiff asserts Dr. McGuire insisted on remaining across the room from her. (*Id.*) Plaintiff alleges she felt humiliated and miserable. (*Id.* ¶¶ 2, 11, 34.)

Dr. McGuire does not recall where he sat during the exam. (*Id.* ¶ 7.) Dr. McGuire's Physician's Assistant, Danielle St. Onge, believes she was in the room during the appointment. (*Id.* ¶ 5.) PA St. Onge said she did not observe Dr. McGuire acting rude or unprofessional, but she does not remember whether Dr. McGuire made the statements Plaintiff describes. (*Id.* ¶ 5; DRPSAMF ¶ 5, ECF No. 47.) Ann Covey, PT, who subsequently spoke with Plaintiff, concluded that Plaintiff did not consider her interaction with Dr. McGuire during the appointment to be positive. (*Id.* ¶ 12.)

## D. Appointments with Other Providers

On June 25, 2013, Plaintiff was seen by Alisa Roberts, D.O., on a referral for injection therapy to address her right shoulder pain prior to surgery. (DSMF ¶ 17.) Dr. Roberts wrote: "Patient has a history of Tourette's syndrome and one of her tics is a repetitive shoulder flexion [on] the right side (in a punching motion) – this makes pain worse and she feels that this displaces her shoulder anteriorly," and that Plaintiff had a fair amount of tendinitis and muscle strain from her initial trauma (in 2011) and from continued uncontrolled repetitive upper extremity movements. (*Id.* ¶ 18.) Dr. Roberts performed a

musculoskeletal examination and noted: "rotator cuff muscles intact. Motor strength is full." (*Id.* ¶ 19.)

In September 2013, Plaintiff called Defendant to cancel her surgery. (*Id.* ¶ 20.) On October 9, 2013, Plaintiff returned to see Dr. Roberts for another injection. Dr. Roberts reported that Plaintiff's "shoulder chronically subluxes, made worse from punching motion that is uncontrolled due to her Tourette's syndrome." (*Id.* ¶ 21.)

On October 29, 2013, Plaintiff was seen by Gregory Unruh, D.O., at St. Joseph Family Medicine; Plaintiff told him that she was "worried about how she will keep the shoulder from moving with her Tourette's." (*Id.* ¶ 22.) Plaintiff had "great concerns" that she would be unable to remain still after the surgery due to her tics and that she might reinjure herself post-operatively. (*Id.* ¶ 23.)

On November 4, 2013, PT Covey reported to Defendant that Plaintiff was "very concerned about having the surgery because her Tourette's are so bad that she might re-injure herself." (*Id.* ¶ 24.) PA St. Onge told PT Covey that there would be no limitation on Plaintiff's right shoulder post-operatively; Plaintiff would be provided with a sling for comfort, but not for immobility. (*Id.* ¶ 25.) PT Covey shared this information with Plaintiff. (*Id.* ¶ 26.)

On November 7, 2013, Plaintiff returned to Defendant's office for a pre-operative appointment with PA St. Onge. At that time, Plaintiff reported that she had decided to proceed with right shoulder surgery. (*Id.* ¶ 27.) PA St. Onge recorded that she discussed the planned procedure with Plaintiff, including the benefits and risks of the procedure, which risks included incomplete relief of pain and symptoms, failure of repair, and need

4

for additional surgery. (*Id.* ¶ 28.) PA St. Onge told Plaintiff that she would not have any restrictions following the surgery and that she would be in a sling for comfort, which could be removed. (*Id.* ¶ 29.) Plaintiff also signed an informed consent that included the following language:

> My physician has discussed with me the details of my medical condition, the nature of the proposed procedure and the benefits to be reasonably expected compared with alternative treatment approaches. . . .
>
> No Guarantee: My physician has represented to me that no guarantee has been made to me concerning the results of his surgery/procedure.
>
> Extension of Operation: My physician has explained to me that during the course of surgery unforeseen conditions may be revealed, that may require a change or extension of the operation. I authorize such additional surgical procedures as are necessary for my condition . . . .

(*Id.* ¶ 30.)

**E.     The First Surgery**

On November 13, 2013, Dr. McGuire performed the surgery, which included open distal clavicle excision, meaning the removal of one centimeter of the distal clavicle and arthroscopy. (*Id.* ¶¶ 31 – 32.) During the arthroscopic portion of the procedure, Dr. McGuire identified a partial thickness tear of the subscapularis and a full thickness tear of the supraspinatus and infraspinatus muscles, meaning a partial thickness rotator cuff tear and a full thickness rotator cuff tear. (*Id.* ¶ 33.) Dr. McGuire debrided and smoothed the rough edges around the partial thickness and full thickness rotator cuff tears. (*Id.* ¶ 34.)

Dr. McGuire elected to perform debridement to address the full thickness tear, rather than attempting a rotator cuff repair, because he believed Plaintiff would re-tear the tendon following surgery when Plaintiff experienced movements caused by her Tourette's

5

syndrome. (*Id.* ¶¶ 35 – 36.) According to Plaintiff, Dr. McGuire later said that he would never perform a rotator cuff repair on a patient like Plaintiff. (PSAMF ¶ 18.) While Dr. McGuire's medical records of the surgery state that he had previously discussed with Plaintiff the possibility of a rotator cuff tear, Plaintiff maintains Dr. McGuire never told her before surgery that she may have a rotator cuff tear. (*Id.* ¶ 55 – 59.)

Following the surgery, PA St. Onge advised Plaintiff that a full thickness rotator cuff tear was identified during surgery, but that it could not be repaired due to the risk of disruption from her Tourette's. (DSMF ¶ 42.) Plaintiff had several appointments at Defendant's office and with other providers, including PT Covey, during which Plaintiff discussed post-operative pain and changes in sensation in her back and right shoulder. (*Id.* ¶¶ 43 – 44, 46 – 49.) Plaintiff's last treatment with Dr. McGuire, PA St. Onge, or any other provider at Defendant's office for her shoulder was November 26, 2013.[1] (*Id.* ¶ 45.)

**F.     The Second Surgery**

In September 2014, Plaintiff fell on her right shoulder; she reported continued problems in the right shoulder to PT Covey. (*Id.* ¶ 50.) On November 19, 2014, Plaintiff saw Jessica Aronowitz, M.D., an orthopedic surgeon. (*Id.* ¶ 51.) Dr. Aronowitz ordered an MRI, which confirmed a full thickness rotator cuff tear of the supraspinatous tendon. (*Id.* ¶ 52.) Dr. Aronowitz agreed that a factor to be considered in determining the appropriate treatment was Plaintiff's Tourette's syndrome. (*Id.* ¶ 54.) Dr. Aronowitz noted the complex nature of Plaintiff's problem, including immobilizing Plaintiff's shoulder after

---

[1] Plaintiff returned to Defendant's office after the alleged discrimination for orthopedic care from another doctor related to a knee issue. (*Id.* ¶ 81.) Plaintiff does not assert she was subject to discrimination during the subsequent, unrelated visits. (*Id.* ¶ 82.)

6

surgery. (*Id.* ¶ 56.) On February 19, 2015, Dr. Aronowitz performed rotator cuff repair surgery on Plaintiff's right shoulder. (*Id.* ¶ 55.)

Dr. Aronowitz added an additional swathe to the sling Plaintiff wore after the rotator cuff repair surgery to help prevent Plaintiff's arm from moving. (PSAMF ¶ 67.) Dr. Aronowitz's records reflect that the attempted immobilization following surgery was "quite challenging." (DSMF ¶ 58.) After the surgery, Plaintiff suffered several falls, one in late February 2015, one in July or August 2015, and one in October or November of 2015. (*Id.* ¶¶ 59 – 62.)

Despite the use of an immobilizing device with a swath following surgery, Plaintiff suffered disruption of the rotator cuff repair. (*Id.* ¶ 63.) An MRI on March 1, 2017, showed a "large full thickness defect" in the supraspinatus tendon, and a partial tearing of the infraspinatous tendon. (*Id.* ¶ 64.) On March 23, 2017, Plaintiff saw Dr. Aronowitz; Dr. Aronowitz concluded that further rotator cuff repair surgery was not indicated. (*Id.* ¶ 65.)

**G.    Medical Opinions**

On May 15, 2017, Plaintiff consulted Mark Price, M.D., at Massachusetts General Hospital, who concluded that Plaintiff had a large residual tear of the rot[at]or cuff tendon. (*Id.* ¶¶ 66, 67.) Dr. Price ultimately concluded that Plaintiff had an "irreparable" right rotator cuff tear. (*Id.* ¶ 68.) In a February 14, 2018, note, Dr. Price wrote: "[Another doctor and I] both expressed some concern with doing a reverse arthroplasty given the degree of tics that she has an[d] instead think that a superior capsular reconstruction would better serve her purposes." (*Id.* ¶ 69.)

Plaintiff's expert witness, Uma Srikumaran, M.D., who has performed surgeries on patients with movement disorders, believes that while there may be more risk associated with shoulder surgery for such a patient, it is permissible to explain the risk and perform the surgery if the patient wants the surgery. (PSAMF ¶ 92 – 93). Dr. Srikumaran opines that the physician's role is to weigh the risks and benefits of a procedure by obtaining information about the patient's goals and degree of pain, and that informed consent is a shared decision-making process. (PSAMF ¶¶ 95, 97, 99.) Dr. Srikumaran does not criticize Dr. McGuire for refusing to perform a rotator cuff repair. (DSMF ¶ 70.) Dr. Srikumaran was not surprised that Dr. Aronowitz's attempt to repair Plaintiff's rotator cuff failed or that Plaintiff suffered a disruption of her rotator cuff repair. (*Id.* ¶ 72.)

Another of Plaintiff's experts, Charles Vega, M.D., a family physician, agrees that it is important to consider a patient's disabilities when choosing a treatment plan and that the possibility of Plaintiff re-injuring her arm after surgery due to her Tourette's syndrome was a reasonable concern. (*Id.* ¶¶ 73 – 78.)

According to Defendant's expert, Thomas Gill, M.D., given Plaintiff's history and the results of the tests that were performed, he would have been concerned about the acromioclavicular joint impingement and bursitis in the biceps, not a rotator cuff tear. (*Id.* ¶ 79.) Dr. Gill, therefore, believes his pre-operative discussion with the patient would have involved acromioclavicular joint surgery, as Dr. McGuire's did, rather than rotator cuff repair. (*Id.* ¶ 80.)

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the Plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986).

### 1. ADA Title III

"Title III of the ADA targets discrimination by privately operated places of public accommodation. . . ." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 303 – 04 (1st Cir. 2003). The law's general prohibition provides that: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services,

facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). The statute clarifies the general prohibition with three other general rules prohibiting, "on the basis of disability": (1) the "denial of the opportunity . . . to participate in or benefit from" the public accommodation, (2) providing an "opportunity to participate in or benefit from" the public accommodation "that is not equal to that afforded to other individuals," and (3) providing a public accommodation that is "different or separate from that provided to other individuals, unless such action is necessary . . . ." *Id.* § 12182(b)(1)(A)(i) – (iii).

"Discrimination" is more specifically defined to include, in relevant part: (1) "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . unless such criteria can be shown to be necessary;" (2) "a failure to make reasonable modifications in policies, practices, or procedures . . . unless making such modifications would fundamentally alter the nature of" the public accommodation. *Id.* § 12182(b)(2)(A)(i) – (ii).

Title III incorporates the remedies of the public accommodation provisions of the Civil Rights Act of 1964, which "allows only injunctive relief (as opposed to money damages)." *Dudley*, 333 F.3d at 304. A Title III claim, "therefore requires some ongoing harm (or, at least, a colorable threat of future harm)." *Id.*

    a.    Standing

The United States Constitution's limitation on the federal courts' jurisdiction to "Cases" and "Controversies" requires that a party invoking federal jurisdiction establish: (1) an injury in fact that is concrete and particularized, and actual or imminent, not

conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) it must be likely as opposed to merely speculative that the injury could be redressed with a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 – 61 (1992). When seeking only prospective relief, it is not enough for a plaintiff to point to a past instance of harm; a plaintiff must show that he or she "face[s] a real and immediate threat of again being illegally" harmed. *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

A plaintiff's abstention from desired opportunities based on knowledge of potentially harmful conduct from others can sometimes be sufficient to establish standing for prospective relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 182 – 185 (2000); *Fiedler v. Ocean Properties, Ltd.*, 683 F. Supp. 2d 57, 69 (D. Me. 2010) (explaining *Laidlaw*: "because the plaintiffs alleged an actual injury in the form of current deterrence, the Supreme Court did not require the same specific intentions to return that were necessary to show imminent injury" in *Lujan*). "Thus, where, as here, an ADA plaintiff alleges actual injury, [s]he must establish [s]he is 'currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA.'" *Fiedler*, 683 F. Supp. 2d at 68 (quoting *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002)).

Accordingly, in the ADA Title III context, the standing inquiry focuses more "upon whether the barrier remains in place" than "upon how many attempts a plaintiff has made to overcome a discriminatory barrier. . . ." *See Dudley*, 333 F.3d at 305. As this Court

11

(Woodcock, J.) stated when addressing the issue in its order on Defendant's earlier motion to dismiss:

> [C]ourts have considered several factors to determine whether the plaintiff has alleged or established a real or immediate threat of injury, including: whether the plaintiff resides within close proximity to the defendant's hospital; the number of prior visits alleged by the plaintiff; whether the plaintiff has a medical condition that will likely require attention in the future; and whether the defendant hospital has changed its policy so as to accommodate the plaintiff in the future.

(16-cv-00582 ECF No. 11 at 12, quoting *Benavides v. Laredo Med. Ctr.*, No. L-08-105, 2009 WL 1755004 at *4 (S.D. Tex. Jun. 18, 2009)); *see also Harris v. Stonecrest Care Auto Ctr., LLC*, 472 F. Supp. 2d 1208, 1216 (S.D. Cal. 2007) ("[C]ourts have examined factors such as: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definiteness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the accommodation in question").

The summary judgment record supports the Plaintiff's standing. The record established that (1) Plaintiff lives in the area of Defendant's office, (2) Plaintiff visited the office numerous times (including after the incident in question for other orthopedic issues with a different doctor), (3) Plaintiff has medical issues that will likely require further medical attention, and (4) there have been no policy changes that would ensure that Plaintiff would not experience similar treatment in the future if she returned for further treatment. The facts are sufficient to establish standing to pursue an ADA Title III claim if the conduct of which she complains constitutes a violation of the statute.

### b. Merits of the Discrimination Claim

Under Title III, a plaintiff must establish that he or she "comes within the protections of the ADA as a person with a disability" and also must show that "the defendant's establishment is subject to the mandates of Title III as a place of public accommodation." *Dudley*, 333 F.3d at 307. The record establishes that Plaintiff's Tourette's syndrome is a disability under the act and that "health services" establishments fall within the scope of the ADA mandates. *See* 42 U.S.C. § 12101.

Plaintiff must also satisfy a third element - that Defendant discriminated against her "within the meaning of the ADA." *See Marradi v. K&W Realty Inv. LLC*, No. CV 16-10038-LTS, 2016 WL 5024198, at *3 (D. Mass. Sept. 15, 2016). Plaintiff has not established a "denial" of service "on the basis of disability," *see* 42 U.S.C. § 12182(b)(1)(A)(i), because the undisputed evidence establishes that Defendant's employees examined and treated her. Plaintiff also has not shown that she was segregated from other patients or provided "separate" services or accommodations "on the basis of disability." *See Id.* § 12182(b)(1)(A)(iii).

Plaintiff contends she was afforded services "on the basis of disability" that were "not equal to that afforded to other individuals." *Id.* § 12182(b)(1)(A)(ii). Plaintiff initially points to Dr. McGuire's decision not to repair her rotator cuff tear when he discovered it during surgery because he believed her tics would disrupt the repair. (Complaint ¶¶ 23 – 24). This allegation sounds in medical malpractice, not discrimination, and thus does not support Plaintiff's ADA claim. Specific medical decisions, which must account for a patient's conditions and traits to meet the professional standard of care, generally do not

13

constitute unequal service delivery "on the basis of disability" within the meaning of the ADA. *Lesley v. Hee Man Chie*, 250 F.3d 47, 54 n.6 (1st Cir. 2001) ("to read the ADA as prohibiting a medical decision-maker from considering medical factors flowing from a disability would put the disabled patient . . . in a different, arguably worse, position than the nondisabled patient") (quoting M. Crossley, *Of Diagnoses and Discrimination: Discriminatory Nontreatment of Infants with HIV Infection*, 93 Colum. L.Rev. 1581, 1655 (1993)); *see also Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) ("we agree with two other circuits that have recently concluded a lawsuit under the Rehab Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions"); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) ("These are the sort of purely medical decisions that we have held do not ordinarily fall within the scope of the ADA or the Rehabilitation Act"); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) ("The Rehabilitation Act, like the ADA, was never intended to apply to decisions involving the termination of life support or medical treatment"); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a remedy for medical malpractice"); *United States v. Univ. Hosp., State Univ. of New York at Stony Brook*, 729 F.2d 144, 157 (2d Cir. 1984) ("Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory'").

Plaintiff also alleges that Defendant failed to make reasonable modifications in policies, practices, or procedures, and that "[t]he modification that [Defendant] should have provided to [Plaintiff] would be a repair of her rotator cuff tear during the surgery, followed

by a shoulder immobilizer to address any concern of involuntary movement of her shoulder." (Complaint ¶¶ 25 – 28.) Plaintiff's attempt to frame the issue as a "modification" to Defendant's "policies, practices, or procedures" does not alter the essence of the claim. The decision as to whether to perform a rotator cuff repair "procedure" is not a policy, practice or "procedure" within the meaning of the ADA for which a patient can request a reasonable modification. Even if it were, the evidence in the record shows that Plaintiff did not request such a modification. *See Dudley*, 333 F.3d at 307 ("the plaintiff must show . . . that [s]he (the plaintiff) requested a reasonable modification in that policy or practice which, if granted, would have afforded [her] access to the desired goods . . . and that the defendant nonetheless refused to modify the policy or practice").

Plaintiff further argues that "Dr. McGuire discriminated against her because of her disability, by failing to have any discussion about Tourette's or how it would impact his plan of care," which failure Plaintiff contends deprived her of "the right to engage in shared decision making and full informed consent about treatment risks, benefits, and alternatives." (Opposition at 2, ECF No. 42). This theory of liability also sounds in medical malpractice. While informed consent might in some instances be viewed as a distinct theory of tort liability from malpractice during diagnosis and treatment, *see e.g.*, *Santana-Concepcion v. Centro Medico del Turabo*, Inc., 768 F.3d 5, 9 (1st Cir. 2014), the theory nevertheless represents the medical decision-making that courts have uniformly declined to scrutinize in the disability context, "[l]est questions of medical propriety be conflated with questions of disability discrimination . . . ." *Lesley*, 250 F.3d at 54.

Ultimately, medical care decisions can only be challenged "by showing the decision to be devoid of any reasonable medical support." *Id.* at 55.

> [T]he point of considering a medical decision's reasonableness in this context is to determine whether the decision was unreasonable *in a way that reveals it to be discriminatory.* In other words, a plaintiff's showing of medical unreasonableness must be framed within some larger theory of disability discrimination. For example, a plaintiff may argue that her physician's decision was so unreasonable-in the sense of being arbitrary and capricious-as to imply that it was pretext for some discriminatory motive, such as animus, fear, or "apathetic attitudes."

*Id.*[2] (emphasis in original). The summary judgment record in this case does not include a genuine dispute as to whether Dr. McGuire's medical decisions were "devoid of any reasonable medical support."

When the record, including the expert witness testimony, is viewed most favorably to Plaintiff, the only dispute concerning the reasonableness of Dr. McGuire's conduct is Plaintiff's contention that Dr. McGuire maintained his distance from Plaintiff during the initial appointment, because he did not want Plaintiff to hit him. While some courts examine whether a Title III defendant took any "adverse action" against a disabled individual, *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999), Plaintiff has not pointed to any cases, and the Court has found none, in which a court found conduct such as Plaintiff alleges, standing alone, to be sufficient to constitute an adverse action amounting to discrimination. *See e.g., Bradley v. Walmart Store No.* 1749, No. 14-CV-225-PB, 2014 WL 4146809, at *1 (D.N.H. Aug. 18, 2014) ("There is, in general, no cause

---

[2] This and several of the other decisions of the circuit courts of appeals interpreted "discrimination" under the Rehabilitation Act, rather than the ADA, but the Rehabilitation Act "is interpreted substantially identically to the ADA." *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 31 n.4 (1st Cir. 1996).

of action to remedy a verbal insult by a private individual. Accordingly, the claim asserting injury due to an offensive remark should be dismissed"). Even if Dr. McGuire's conduct during the initial examination (i.e., his alleged comment and distance from Plaintiff) amounted to adverse action, Plaintiff cannot recover based on a past incident. Title III offers only prospective relief for ongoing or future violations. While a policy or practice of employees making negative or offensive comments related to disabilities could conceivably constitute discrimination due to an unequal enjoyment of a public accommodation, this record does not support such a claim.

Finally, Plaintiff contends Dr. McGuire's actions toward Plaintiff based on her disability are such that one can reasonably infer that his medical decisions regarding the surgery and his discussions with Plaintiff about her treatment and medical risks reflect a discriminatory motive or animus. Although the record includes conflicting evidence regarding the propriety of Dr. McGuire's alleged conduct during his initial examination of Plaintiff, the record lacks any evidence to suggest that his medical decisions were the product of a discriminatory animus.

In sum, on this record, Plaintiff cannot sustain a claim under the ADA. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

### 2. Maine Human Rights Act

The Maine Human Rights Act (MHRA) is designed to protect the interests of individuals in fair employment, fair housing, public accommodations, and educational opportunity, against discrimination on the basis of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin, age, and familial status.

5 M.R.S. § 4552. Regarding disability discrimination, "[i]t is settled law that the MHRA should be construed and applied along the same contours as the ADA." *Dudley*, 333 F.3d at 312; *see also Winston v. Maine Tech. Coll. Sys.*, 631 A.2d 70, 74 (Me. 1993) ("We have stated that because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA"). The Court's reasoning on Plaintiff's ADA claim also governs Plaintiff's MHRA claim. Defendant, therefore, is entitled to summary judgment on Plaintiff's MHRA claim.[3]

## CONCLUSION

Based on the foregoing analysis, the Court grants Defendant's Motion for Summary Judgment. (ECF No. 35).

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 2nd day of May, 2019.

---

[3] Defendant also argues that Plaintiff's MHRA claim is barred by the requirement that actions brought pursuant to the MHRA must be commenced within two years of the allegedly discriminatory act(s). 5 M.R.S. § 4613(c). Because the Court finds that Defendant is entitled to summary judgment on Plaintiff's MHRA claim on the same grounds as on Plaintiff's ADA claim, the Court does not reach the issue.